**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Michael PRUITT, Appellant**

**No. 727 CAP**

Supreme Court of Pennsylvania.

SUBMITTED: January 9, 2017
DECIDED: June 20, 2017

---

Michael David Dautrich, Esq., Dautrich and Dautrich, for Michael Pruitt, Appellant.

Jonathan H. Kurland, Esq., Berks County District Attorney's Office, Amy Zapp, Esq., Office of Attorney General, for Commonwealth of Pennsylvania, Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## *OPINION*

### CHIEF JUSTICE SAYLOR

This is a capital post-conviction appeal.

On September 23, 2003, Appellant forcibly entered the Berks County home of Greta A. Gougler, where he robbed, raped, and murdered her. Appellant was arrested, tried, and convicted for first-degree murder, rape, robbery, and other offenses, and a jury returned a death verdict in a capital sentencing proceeding. On direct appeal, this Court affirmed. *See Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307 (2008).

In 2009, Appellant commenced the present proceedings under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA"). The post-conviction court conducted a series of evidentiary hearings, throughout which Appellant was represented by the members of the Federal Community Defender Office. Later, per Appellant's request, those attorneys were removed from the representation and current counsel was appointed in their place.

In 2015, Appellant submitted a request to proceed *pro se*. The PCRA court scheduled a proceeding, at which Appellant agreed to continue to be represented by counsel but was deemed by the court to have "knowingly, intelligently and voluntarily abandon[ed] any issues raised by prior PCRA counsel and/or [current counsel] that are not contained in [a] memorandum in support of the PCRA relief petition filed this date[.]" N.T., Nov. 23, 2015, at 9–10.

The PCRA court subsequently denied relief on the remaining claims for relief. This appeal followed, in which Appellant advances six challenges, several of which fall within the category of the claims deemed to have been abandoned by the PCRA court.

### Part I

Appellant's first three claims, pertaining to DNA evidence presented by the Commonwealth at trial, were found by the PCRA court to have been preserved. The relevant background is as follows.

At trial, the prosecution offered several primary lines of evidence to address Appellant's identity as the robber, rapist, and killer, as well as the *actus reus* of the rape. First, Appellant's confession to police was introduced, in which he admitted to having forcibly entered Ms. Gougler's home and inflicting physical violence upon her, albeit that he denied any intention to kill and maintained that he did not rape the victim. *See* N.T., Apr. 25, 2005, at 174–177. The Commonwealth also presented testimony from a witness to whom Appellant had confessed, extra-judicially, to having perpetrated the physical acts resulting in the victim's death. *See* N.T., Apr. 26, 2005, at 247–48 (testimony of Sean Peterson).

In a second category of evidence, a forensic pathologist testified that the victim had been beaten severely and subjected to ligature strangulation. *See id.* at 355–365. In terms of the rape, the pathologist explained that the victim suffered lacerations and other injuries to her vagina and anus consistent with nonconsensual penetration. *See id.* at 352–355, 364. Police officers also attested that the victim's body was naked when discovered. *See, e.g.,* N.T., Apr. 25, 2005, at 22, 31.

In the third set of evidence, the Commonwealth sought to confirm the fact of the rape, and Appellant's identity as the rapist, through testimony establishing a match between Appellant's DNA and a sample of genetic material taken from the inner thigh of the victim's body. In this regard, crime-laboratory serologist Michael Brincat testified that this evidence sample contained both blood and sperm cells. *See* N.T., Apr. 26, 2005, at 290–291. Pennsylvania State Police ("PSP") forensic scientist Lisa Mihalacki then testified that she segregated the sample into male and female components and conducted DNA analysis. According to the witness: "Every genetic marker, every place that we

checked from this sample and [Appellant's] were identical to each other," resulting in between a one in 1.5 billion and a one in 39 billion chance that another person might have contributed the sample (with the variation accounted for by racial differences within the population). *Id.* at 313–314.[1] On cross-examination, Appellant's lawyer initially pointed out that the DNA data reflected that there was more than one contributor to the portion of the evidence sample denominated as the male component. *See id.* at 316–320.[2] The remainder of the cross-examination focused on racial differences in the population samples and the handling of the evidence samples. *See id.* at 320–323.

In the post-conviction proceedings, Appellant contended that there were multiple flaws in the Commonwealth's DNA analysis and that his trial counsel were derelict in failing to apprehend and capitalize upon such deficiencies.[3] In support, Appellant presented testimony from Randal T. Libby, PhD, a forensic geneticist. Dr. Libby testified that the "male" component of the evidence sample taken from the victim's thigh was of a low-template quality and,

---

1. The DNA analysis discussed at trial and in the post-conviction proceedings was presented in the form of numerical expressions of the length of repeat DNA sequences found at discrete locations, or loci, on a chromosome. At each locus, testing generally produces measurements for two DNA fragments, or allele, one contributed by each of the subject's parents. *See* N.T., Apr. 26, 2005, at 316–17. *See generally Commonwealth v. Blasioli,* 552 Pa. 149, 154–58, 713 A.2d 1117, 1119–23 (1998) (discussing the science underlying forensic DNA analysis); 1 KENNETH S. BROUN, 1 McCORMICK ON EVIDENCE § 205 (2013) (explaining the use of DNA profiling to detect the number of repeats, at given locations, for different alleles on a graph known as an electropherogram). For example, the expression "D13S317 11, 12," taken from Ms. Mihalacki's report as it concerns the male component of the evidence sample taken from the victim's thigh, signifies

that, at the loci denominated D13S317, a particular genetic sequence repeated itself 11 times in one of two DNA fragments, and 12 times for the other.

2. As noted, ordinarily, each genotype found at a particular chromosomal location will generate two numbers, one deriving from the DNA strand inherited from the contributor's mother and one from the father. *See supra* note 1. However, several of the genotypes reflected in Ms. Mihalacki's report assigned to the female component of the evidence sample taken from the victim's thigh contained more than two numbers, thus indicating the presence of multiple contributors.

3. Appellant was represented at trial by two attorneys, one of which took the lead at the guilt phase. *See* N.T., Dec. 19, 2013, at 1049.

accordingly, generated a great deal of subjectivity in interpreting the testing result. *See, e.g.,* N.T., Aug. 21, 2013, at 32–38, 59, 62, 64–65, 80.[4]

Indeed, it was Dr. Libby's opinion that the sample contained insufficient DNA to yield a reliable analysis. *See id.* at 51, 87. This, the geneticist explained, was reflected, *inter alia,* in the absence of any data whatsoever in Ms. Mihalacki's report pertaining to alleles at three loci for the male evidence sample. *See id.* at 54, 65–66. Additionally, Dr. Libby affirmed that this report itself indicated that results at five loci were "[i]nconclusive due to an insufficient amount of DNA." *Id.* at 62–63.

Dr. Libby also found the interpretive enterprise to have been further complicated by the obvious presence of multiple contributors (as was alluded to during cross-examination at trial). *See id.* at 47, 68–70; *see also supra* note 2. Moreover, he posited that the results of Ms. Mihalacki's analysis in fact suggested that Appellant should be excluded as a contributor to the evidence sample. *See, e.g.,* N.T., Aug. 21, 2013, at 51, 54–55, 95. It was also the geneticist's opinion that there were too many inconsistencies in the data to justify the use of a statistical analysis to support the probability estimates that Ms. Mihalacki offered in her testimony. *See id.* at 94.[5]

In terms of Ms. Mihalacki's assertion at trial of a match at every genetic marker, Dr. Libby testified that such testimony was demonstrably false according to her own report. *See id.* at 73–75. Dr. Libby further attested that the conclusion that the male component of the evidence sample contained sperm was unverifiable, since sperm tails were undetectable upon microscopic examination. *See id.* at 75–79. Finally, Dr. Libby noted that data from Ms. Mihalacki's initial analysis of the evidence sample, which she apparently had discounted in favor of further testing, had resulted in an affirmative exclusion of Appellant as a possible contributor to the evidence sample. *See id.* at 133. In this regard, Dr. Libby suggested that Ms. Mihalacki's methodology conflicted with the scientific norm of reproducibility. *See id.* at 130–134.

Appellant also presented testimony from his lawyer primarily responsible for his representation at the guilt phase of trial. The attorney testified that he was not significantly concerned with the DNA evidence, because the Commonwealth already had adduced compelling physical evidence demonstrating the fact of rape via the

---

**4.** *See generally* Erin Murphy, *The Art in the Science of DNA: A Layperson's Guide to the Subjectivity Inherent in Forensic DNA Typing,* 58 Emory L.J. 489, 503–08 (2008) (discussing stochastic effects such as allelic dropout in terms of introducing subjectivity in DNA analysis of low-template samples).

**5.** For example, Dr. Libby observed an inconsistency in Ms. Mihalacki's interpretive assumptions pertaining to potentially homozygous alleles. In this regard, assuming a robust sample of genetic material, where a single allele is detected at a particular location, it is generally appropriate to assume the subject has two of the same alleles at that location, which are termed homozygous. *See* N.T., Aug. 21, 2013, at 45.

The inconsistency in assumptions arose as follows. At one locus Ms. Mihalacki assumed that the genotype for the evidence sample was homozygous because the testing revealed a single length allele; whereas, at another locus, Ms. Mihalacki assumed that a result reflecting a single length allele was incomplete. *See id.* at 64. Notably, Appellant's genotype reflected two different alleles at the marker location, thus indicating a mismatch (and concomitant exclusion of Appellant as a contributor to the evidence sample), were the evidence sample alleles to be deemed homozygous.

Dr. Libby opined that there was no scientific reason, nor anything appearing in the scientific data, to explain Ms. Mihalacki's shifting assumptions. *See id.* at 64–65.

testimony of a forensic pathologist, and moreover, "there was only [Appellant] in the room." N.T., Dec. 19, 2013, at 1201; *see also id.* at 1196 ("[A]ll the DNA did was identify, really identifying [Appellant] as the person who committed the rape. But, you know, the fact of the rape was there, though, and there was no evidence of anybody else being there, so I didn't think it added much."); *id.* at 1219. Counsel explained that he did not wish to draw undue attention to evidence that he considered unimportant. *See id.* at 1202.

Nevertheless, the lawyer affirmed that the Commonwealth's DNA evidence presented a strong indication of Appellant's culpability for rape. *See id.* at 1208. In spite of such materiality, counsel testified that he did not understand the data in Ms. Mihalacki's report and merely relied on her representation of a genetic match between the evidence sample and the sample taken from Appellant. *See id.* at 1207. With reference to the data reflected in the report, the attorney also indicated: "I don't imagine any lawyer would know how that got from A to B or what that means." *Id.* at 1208.

### A. Failure to Investigate, Effectively Cross-examine, and Present an Expert

▮▮ Presently, based on the above, Appellant contends that his counsel failed to conduct a professionally reasonable investigation and rendered deficient stewardship at trial. Appellant argues that, at a minimum, his trial counsel had an obligation to garner at least some rudimentary understanding of the evidence being used against him. He also takes the position that counsel should have consulted with and presented testimony from a defense expert. *See* Brief for Appellant at 16–17 (collecting cases). According to Appellant, trial counsel "essentially conducted the cross-examination of the Commonwealth's DNA expert on the fly." *Id.* at 15. In terms of the materiality of the DNA evidence and its prejudicial impact, Appellant couches it as the "sole forensic evidence linking [him] to the crime" and posits that it played a pivotal role at trial. *Id.* at 16. He concludes that there is a reasonable probability that the jury would have found reasonable doubt to exist had counsel investigated and challenged the Commonwealth's DNA evidence in an effective manner.[6]

At the outset, we find arguable merit in Appellant's challenge to his lawyer's stewardship and conclude that counsel could have had no reasonable strategy to support his failure to gain a better understanding of Ms. Mihalacki's report.[7] Contrary to counsel's comment that no lawyer

---

**6.** The Pennsylvania test for ineffective assistance of counsel is, in substance, the same as the two-part performance-and-prejudice standard set forth by the United States Supreme Court, *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), although this Court has divided the performance element into two subparts dealing with arguable merit and reasonable strategy. Accordingly, to succeed on an ineffectiveness claim, a petitioner must establish that: the underlying legal claim has arguable merit; counsel had no reasonable basis for her action or inaction; and the petitioner suffered prejudice as a result. *See Common-*

*wealth v. Pierce*, 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987).

**7.** *Accord Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (explaining that "a reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results" linking his client to a murder weapon); *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2001) ("To make a reasoned judgment about whether evidence is worth presenting, one must know what it says.").

would apprehend the underlying data, *see* N.T., Dec. 19, 2013, at 1208, the present record reflects that Appellant's post-conviction lawyers amply comprehend it, including the multiple problems stemming from Ms. Mihalacki's interpretation of a partial genetic profile taken from a low-template evidence sample.[8] Moreover, counsel's failure to appreciate—and exploit—the fact that the data in Ms. Mihalacki's initial report apparently indicated an affirmative *exclusion* of Appellant as a contributor to the male evidence sample, *see* N.T., Aug. 21, 2013, at 133–134, is simply inexplicable. To the degree that counsel was unable to understand the test results on his own, plainly he should have consulted an expert.[9]

■ Given the potency of DNA evidence, *see, e.g., McDaniel v. Brown,* 558 U.S. 120, 136, 130 S.Ct. 665, 675, 175 L.Ed.2d 582 (2010) (commenting upon the "persuasiveness of [DNA] evidence in the eyes of the jury"), were this a case in which identity was in controversy, we would likely find prejudice to be manifest. Here, however, Appellant's identity as the robber and killer has never seriously been put into contest, even at the post-conviction stage. *Accord* N.T., Dec. 20, 2013, at 1298 (reflecting the attestation of Appellant's trial counsel that Appellant consistently confirmed the facts that he had related to the police, which included his perpetration of a violent attack upon the victim). Although Appellant did not admit to having perpetrated the rape, the fact of such crime was apparent from the physical evidence, and Appellant has never provided any plausible explanation that would persuasively suggest any other person's involvement in the relevant events that took place in the victim's house. *Accord* N.T., Dec. 20, 2013, at 1298 (memorializing trial counsel's testimony that Appellant never indicated that anyone other than he and the victim was present during their encounter).[10] For these reasons, in our

8. *See generally* DAVID L. FAIGMAN, JEREMY A. BLUMENTHAL, EDWARD K. CHENG, JENNIFER L. MNOOKIN, ERIN E. MURPHY & JOSEPH SANDERS, 4 MOD. SCI. EVID. § 31:32 (2013–2014) ("It is fair to say that [low copy number DNA] typing is the subject of great dispute among some of the leading lights in the forensic community."); BROUN, 1 MCCORMICK ON EVIDENCE § 205 ("Even with existing systems, efforts to push [an amplification technique] to its limits in copying only DNA fragments from a few cells (low template or touch DNA samples) have generated controversy."); Bruce Budowle, Arthur J. Eisenberg & Angela van Daal, *Low Copy Number Typing Has Yet to Achieve "General Acceptance"*, FORENSIC SCIENCE INT'L: GENERAL SUPPLEMENT SERIES 2 551–52 (2009).

9. *Accord Gersten v. Senkowski,* 426 F.3d 588, 611 (2d Cir. 2005) (determining that an attorney was ineffective when he "failed to consult or call an expert ... or to educate himself sufficiently on the scientific issues.").

10. At the post-conviction stage, Appellant did adduce some evidence that Appellant was in the presence of a Hispanic man when he decided to "get more money," presumably in a timeframe in temporal proximity to the murder. *See* N.T., Jan. 16, 2014, at 1452–1453. Moreover, trial counsel affirmed that, after the murder, a "tipster" apparently had reported to police that he had seen black and Hispanic males in the victim's yard on the night of the killing. N.T., Dec. 20, 2013, at 1198–1199. No evidence was introduced at trial or in the post-conviction proceedings, however, to the effect that a second intruder ever entered the victim's house, and Appellant does not make any allusion to such a person in the present briefing.

Justice Wecht takes the opportunity to explain that the burden at trial was never on Appellant to suggest another's involvement in the crimes. *See* Dissenting Opinion, *Op.* at 411. As we have indicated, however, in the present posture of the case—on review of claims of deficient stewardship at the post-conviction stage—the burden lies squarely with Appellant. *See supra* note 6.

As also discussed above, the circumstantial evidence of Appellant's perpetration of the rape is very strong, again, arising out of his forcible entry into the victim's residence and

considered judgment—while trial counsel should have provided more able stewardship relative to the DNA evidence—Appellant has not established a reasonable probability that the verdict would have been different had counsel done so, *i.e.*, a probability sufficient to undermine confidence in the outcome of the proceedings. *See Commonwealth v. Laird*, 632 Pa. 332, 343, 119 A.3d 972, 978 (2015).

## B. Assertedly False Testimony and Alleged Concealment of Evidence

■ In his second line of argument, Appellant focuses on Ms. Mihalacki's testimony that "[e]very genetic marker, every place that we checked from this sample and [Appellant's] were identical to each other." N.T., Apr. 26, 2005, at 313. According to Appellant, he was denied due process and the effective assistance of counsel on the basis of this assertedly false attestation.

Appellant supplements this argument with a series of allegations concerning the involvement of a former PSP serologist, Ranae Houtz, in the forensic analysis. Appellant explains that trial counsel was aware that Ms. Houtz bore the responsibility for submission to the DNA laboratory of the samples taken from the victim, *see* N.T., Dec. 19, 2013, at 1209, and that her job performance previously had been questioned by her superiors and others, ultimately resulting in her termination. *See id.* at 1212–1213. Appellant points to one error made by Ms. Houtz in his case, in which she had mislabeled one of the evidence samples. *See* Brief for Appellant at 44–45. Appellant also charges that "[t]he testimony of Ms. Mihalacki and Mr. Brincat was crafted to conceal the involvement—and errors—of [Ms.] Houtz, who was initially

assigned to the case and who resigned from the [PSP] after repeated errors were detected in her work." *Id.* at 43. According to Appellant, his lawyers should have sought discovery regarding Ms. Houtz's performance, undertaken to have her work reviewed by a defense expert, and impeached the testimony of Commonwealth expert witnesses based on Ms. Houtz's involvement, which those witnesses failed to disclose to the jurors. *See id.* at 45 ("Ms. Mihalacki and Mr. Brincat testified falsely regarding Ms. Houtz's involvement and error in this case, concealing from the jury that crucial evidence was processed and tested by a forensic scientist whose repeated errors forced her resignation and called into question her work in over 600 cases.").

■ To the degree that Appellant attempts to frame the issue as one of direct trial court error, the claim is waived for failure to advance it at trial. *See, e.g., Commonwealth v. Keaton*, 615 Pa. 675, 693, 45 A.3d 1050, 1060 (2012) (explaining that an issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding" (quoting 42 Pa.C.S. § 9544(b)). Moreover, despite the aspersions cast upon the Commonwealth, Ms. Mihalacki's report straightforwardly disclosed, *inter alia*, the absence of data at five loci. *See* N.T., Aug. 21, 2013, at 62–63 (reflecting the report's admonition that the report itself indicated that results at five loci were "[i]nconclusive due to an insufficient amount of DNA"). While clearly she should have been more careful in her testimony at trial, affording her the benefit of the doubt, Ms. Mihalacki's overstatement may have reflected an attempt to express

his otherwise brutal treatment of the victim, and in the absence of evidence that any other potential perpetrator had entered the home

during the time frame in which the victim was brutalized, raped, and killed.

her belief that Appellant's profile matched the evidence sample at the genetic markers for which data was present. Notably, Appellant's own expert recognized that, although there is disagreement concerning the scientific validity of such an approach, various laboratories will declare DNA matches based on partial profiles. *See* N.T., Aug. 21, 2013, at 60.[11]

With regard to Ms. Houtz, before trial the Commonwealth discussed her involvement with defense counsel and explained that the serology testing had been repeated by Mr. Brincat. *See, e.g.,* N.T., Dec. 19, 2013, at 1398–1399. Mr. Brincat's report also indicated—in bold capital type—that the relevant samples of genetic material had been submitted to the DNA laboratory in October 2002, about five months before Mr. Brincat testified that he began his own testing of samples pertaining to Appellant's case. *See* N.T., Apr. 26, 2005, at 301. This too, then, was information readily available to counsel.

■ In terms of the ineffectiveness dynamic, we express reservations concerning trial counsel's performance similar to those indicated in our treatment of Appellant's initial claim, above. Plainly, in response to Ms. Mihalacki's assertion of a match at every genetic marker incorporated into the testing, counsel should have confronted the witness with her own report disclosing missing data at five loci. Counsel was also armed with enough information to disclose Ms. Houtz's involvement in the initial testing and in the chain of custody underlying the DNA analysis.

In any event, our resolution of the issue again turns on Appellant's inability to es-

tablish prejudice in light of the compelling other evidence establishing his identity as the robber and killer and the fact of a rape, and the absence of any plausible alternative theory to discount that Appellant was also the rapist.

**C. Cumulative Effect of Alleged *Napue* and *Brady* Violations**

■ Appellant next characterizes the assertedly false testimony and alleged concealment of evidence as violations of *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (holding that the knowing use of false testimony to obtain a conviction violates due process), and *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (reflecting the obligation, on the part of prosecutors, to disclose exculpatory information material to the guilt or punishment of an accused). Appellant catalogues the asserted taints as follows:

- The Commonwealth presented Ms. Mihalacki's false and misleading testimony that [Appellant's] DNA matched the perpetrator's DNA;

- The Commonwealth presented Mr. Brincat's false and misleading testimony concealing the involvement of Ms. Houtz in preparing samples used in DNA testing;

- The Commonwealth presented Ms. Mihalacki's false and misleading testimony concealing the involvement of Ms. Houtz in preparing samples used in DNA testing;

- The Commonwealth suppressed evidence that would have revealed the

11. This author has previously expressed the concern that the methodology used in the profiling of low-template DNA samples may not have gained the degree of general acceptance in the scientific community required to meet the standard of admissibility for novel

scientific evidence in Pennsylvania. *See Commonwealth v. Treiber,* 632 Pa. 449, 539–40 & n.18, 121 A.3d 435, 489 & n.18 (2015) (Saylor, C.J., dissenting); *see also supra* note 8. Appellant, however, has not invoked that standard in this appeal.

false and misleading testimony of Mr. Brincat;

- The Commonwealth suppressed evidence that would have revealed the false and misleading testimony of Ms. Mihalacki;
- The Commonwealth suppressed evidence that would have exposed at least one error by Ms. Houtz during her preparation of samples for DNA testing; and
- The Commonwealth suppressed evidence indicating that other errors may have been made in the handling and testing of the samples.

We reiterate that the Commonwealth had disclosed to the defense both that the evidence sample taken from the victim's thigh resulted in an incomplete DNA profile and that Mr. Brincat was tasked with repeating the serology analysis previously undertaken by Ms. Houtz. Particularly since this information was known (or, at the very least, should have been known) to counsel, the attorney apparently could have presented at trial precisely the same challenges as are reflected in the present briefing. As such, we find the instant claim to be unpreserved in its entirety. *See Commonwealth v. Cousar*, —— Pa. ——, ——, 154 A.3d 287, 301 (2017) ("*Brady* claims ... may be subject to waiver."); *cf. Routly v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994) ("There is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object.").

### Part II

■ The PCRA court deemed all remaining claims to have been abandoned by Appellant, who, in the present briefing, vigorously challenges this conclusion.[12] With reference to the abandonment, the PCRA court conducted a discussion with postconviction counsel and a colloquy with Appellant which unfolded as follows.

The court had scheduled a proceeding to address Appellant's request to proceed *pro se*. At the outset, the attorney for the Commonwealth announced that the defense intended to withdraw all claims for relief pertaining to the penalty phase of trial and requested a colloquy to confirm Appellant's wishes. *See* N.T., Nov. 23, 2015, at 2. Appellant's counsel responded that the parties were in agreement that counsel could file a revised memorandum elaborating upon specific claims for relief, and that counsel would continue to represent Appellant. *See id.* at 3.

In the ensuing colloquy, Appellant confirmed that he was satisfied for counsel to continue with the representation and stated: "I'm asking for a ruling on the DNA evidence; that's the issue I'm asking for the ruling." *Id.* at 5. Counsel then confirmed this assertion. *See id.* ("We're asking for a new trial based upon ineffective assistance of counsel in handling the various aspects of the DNA evidence through the course of trial."). According to the post-conviction lawyer, Appellant was "making a knowing, conscious decision to abandon those issues that are not contained in the pages of [the] brief" that was to be filed that day. *Id.*

The PCRA court read into the record the headings of each issue to be preserved, which mirror the titles of the three sub-

---

12. Appellant seeks to present three claims in addition to those discussed in Part I, above. These include: an allegation of prosecutorial misconduct; a challenge asserting due process violations and ineffective assistance in the failure of trial counsel to contest the admission of Appellant's pretrial statements; and a final claim of deficient process and attorney stewardship relating to counsel's failure to locate and retain a credible pathologist to assist the defense.

parts of Part I of this opinion. *See id.* at 6–7. The court then told PCRA counsel: "You now have three issues. Three issues. They are all DNA related. That's all you need to discuss because the defendant has said that he's not pursuing anything else." *Id.* at 8. The court then dictated the following order without objection:

> AND NOW, this 23rd day of November, 2015, the Court having conducted a colloquy with regard to the status of the defendant's amended PCRA petitions with the defendant's defense counsel [and the attorney for the Commonwealth], we find that the defendant is knowingly, intelligently and voluntarily abandoning any issues raised by prior PCRA counsel and/or [present counsel] that are not contained in the memorandum in support of the PCRA relief petition filed this date by [present counsel]. The issues raised in this memorandum relate to the DNA evidence presented at trial.

*Id.* at 9–10.[13]

Presently, citing to a decision involving a waiver of the right to counsel, Appellant contends that a post-conviction court is required to conduct a specific, "probing colloquy" before permitting any claims to be abandoned. Brief for Appellant at 61 (quoting *Commonwealth v. Starr*, 541 Pa. 564, 581–82, 664 A.2d 1326, 1335 (1995)). Appellant takes the position that the PCRA court failed to conduct an adequate colloquy so as to clarify what issues he was agreeing to forego. According to Appellant, the court proceeding was "rather confusing in its nature," as, for example, it opened with a discussion of the abandonment of only penalty-phase issues. *Id.* at

63. Furthermore, he asserts that he "expected that the Court would make a decision on his request for Summary Judgment on the DNA claims then he would be able to proceed further with all guilt phase PCRA issues, if necessary." *Id.* By way of additional support, Appellant references *Commonwealth v. Saranchak*, 570 Pa. 521, 810 A.2d 1197 (2002), as an instance in which this Court sanctioned the reassertion of previously abandoned postconviction claims.

■ Initially, we differ with Appellant's position that a developed colloquy is an essential prerequisite to the withdrawal of some claims presented in a post-conviction petition. To the contrary, the advancement of particular challenges to a judgment of sentence is generally considered to be a strategic matter relegated to the sound judgment of counsel. *See Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."); *accord Commonwealth v. Jette*, 611 Pa. 166, 184, 23 A.3d 1032, 1043 (2011).

Here, we recognize that counsel's strategic calculations may not have been the driving force pertaining to the abandonment of at least some of the previously asserted claims. For example, there are suggestions on the record that Appellant was opposed to pursuing penalty-phase relief.

---

**13.** Seven months after the proceeding, Appellant filed a "Nunc Pro Tunc Statement to Correct the Record," asserting that he intended to abandon only penalty-phase claims and that all guilt-phase claims should be deemed to be preserved. The PCRA court found that no action was necessary on this statement, since "the record of the November 23, 2015 colloquy speaks for itself." Memorandum to Clerk of Courts Official File dated July 26, 2016, in *Commonwealth v. Pruitt*, No. 6003–02 (C.P. Berks).

Nevertheless, at the time of the relevant proceedings before the PCRA court, counsel apparently applied his professional judgment in accommodating his client's wishes on the subject of abandonment. Although we agree with Appellant that those proceedings initially opened with a focus upon the abandonment of penalty-phase claims, as reflected above, they took a different turn toward the identification of discrete issues that counsel and Appellant agreed were to be pursued, to the exclusion of all others. This approach is expressly manifested in the admonitions and order of the PCRA court, to which no contemporaneous objection was lodged.

With regard to the *Saranchak* decision, in that case the petitioner had withdrawn his post-conviction petition in its entirety. *See Saranchak,* 570 Pa. at 523, 810 A.2d at 1198. We find such scenario to be materially distinct from a winnowing of extensive claims presented to a post-conviction court. In this regard, again, we also differ with Appellant's position that a colloquy is necessary to support foregoing discrete post-conviction claims—indeed, such decisions are routinely made outside of the presence of the courts.[14]

We conclude that the record supports the PCRA court's determination that Appellant abandoned claims other than those addressed in Part I of this opinion.

The order of the post-conviction court is affirmed.

Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht files a dissenting opinion.

JUSTICE WECHT, dissenting

I share the learned Majority's view that there is arguable merit in Michael Pruitt's challenge to the effectiveness of his trial counsel, and that counsel could have had no reasonable strategic basis for failing to investigate, to understand, or to rebut the Commonwealth's presentation of DNA evidence at trial. I part ways with the Majority in regard to the analysis of prejudice. Unlike the Majority, I conclude that Pruitt suffered prejudice from his trial counsel's manifest dereliction, because there exists a reasonable probability that, but for that dereliction, the jury would have been left with reasonable doubt as to Pruitt's culpability for rape and involuntary deviate sexual intercourse ("IDSI").

Regardless of any concomitant impact upon Pruitt's conviction for first-degree murder, acquittal of those felony sexual offenses would have been likely to alter the ultimate outcome of the proceedings, in that the jury may have assigned lesser weight to the sole aggravating circumstance that it found during the penalty phase—that Pruitt killed Greta Gougler while in the perpetration of a felony. *See* 42 Pa.C.S. § 9711 (d)(6). Identification and exploitation of weaknesses in the Commonwealth's forensic evidence—and recognition that the Commonwealth's expert overstated the strength of that evidence at trial—could have raised a reasonable doubt regarding Pruitt's guilt of these heinous sexual offenses, and, in turn, weakened substantially the Commonwealth's capital case at the penalty phase. It follows that there is a reasonable probability that counsel's failure to challenge the DNA evidence made the difference between a sentence of life imprisonment and a sentence of death. As this was "sufficient to under-

---

14. Appellant's categorical abandonment of all penalty-phase claims presents the circumstance most analogous to the waiver of all claims at issue in *Saranchak.* Notably, however, Appellant does not seek to advance any penalty-phase issues in this appeal.

mine confidence in the outcome of the proceeding,"[1] so as to establish prejudice, I conclude that Pruitt's trial counsel was constitutionally ineffective. Accordingly, I respectfully dissent.

## I. The DNA Evidence

Pruitt was convicted of first-degree murder, robbery, burglary, rape, and IDSI. To prove the sexual offenses, the Commonwealth presented evidence relating to the testing of genetic material that was recovered from Greta Gougler's inner thigh. Full comprehension of Pruitt's claims regarding this evidence requires a brief description of the testing methodology and the conclusions that may be drawn from that testing.

"DNA is genetic material found in most types of cells of the human body, including white blood cells and cells contained in semen and hair follicles." *Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117, 1119–20 (1998). DNA is organized in twenty-three pairs of chromosomes, with one half of each pair inherited from the mother and the other half from the father. David H. Kaye, *DNA Evidence: Probability, Population Genetics, and the Courts*, 7 HARV. J.L. & TECH. 101, 107 n.35 (1993). The functional components of DNA are groups of molecules known as "nucleotides," which join in predictable pairs known as "base pairs" and, when organized in a particular sequence, serve as a code for a specific biological trait. *Blasioli*, 713 A.2d at 1120. What we refer to as a "gene" is a specific sequence of base pairs that is responsible for the expression of an individual human characteristic. *Id.* "Genes are the functional units of the DNA molecule." JUSTICE MING W. CHIN ET AL., DNA BIOLOGY, FORENSIC DNA EVIDENCE: SCIENCE AND THE LAW § 2:2 (2017 ed.) (hereinafter "CHIN"). Each gene may be found at a

particular "locus," which "represents a specific physical location of a gene on a chromosome." Kimberly Cogdell Boies, *Misuse of DNA Evidence Is Not Always A "Harmless Error": DNA Evidence, Prosecutorial Misconduct, and Wrongful Conviction*, 17 TEX. WESLEYAN L. REV. 403, 408 (2011) (hereinafter "Boies").

Most of a person's DNA is identical to that of every other person, with only approximately three million out of a total of three billion base pairs varying between individuals. *Blasioli*, 713 A.2d at 1121. These variations are called "polymorphisms," and they serve as the basis for DNA identification. *Id.* A particular variation is known as an "allele," an "alternative form of a gene that can occupy a particular chromosomal locus." Boies at 408 (quoting *United States v. Chischilly*, 30 F.3d 1144, 1153 (9th Cir. 1994)). An allele also may be described as a "specific pattern of base pairs at a given location on a given chromosome." CHIN at § 2.2. Because individuals inherit genetic material from both parents, there are exactly two alleles at any given polymorphic locus on any given set of complementary chromosomes. *Id.* One allele comes from an individual's mother, and the other comes from the individual's father.

Most commonly, DNA testing is conducted through the identification of alleles by analyzing repeating sequences of base pairs at a particular locus, called "short tandem repeats" ("STR"). Comparison of DNA samples involves the identification of STRs at standardized, designated loci on certain non-coding areas of the DNA strand. These areas are not responsible for the expression of any particular biological trait, but nonetheless contain allelic variations that can be compared to a sample of

---

1. *Commonwealth v. Laird*, 632 Pa. 332, 119 A.3d 972, 978 (2015).

DNA from a known source. CHIN at §§ 2.2, 2.3.

The variability of STR patterns between people is due to the fact that while every person has short repeating sequences of base pairs at the loci used for forensic identification ... the number of repeats differs. For example, at a particular locus, a person may have inherited 12 repeats from her mother and 14 repeats from her father. STRs are "short" because they are only two to six chemical letters long, "tandem" because they are on adjacent chromosomes, and "repeat" because the pattern repeats. One would say that this person's alleles at that locus are "12, 14." A person may receive the same allele from both mother and father at a locus, resulting in a "homozygous" allele pairing of, for example, "16, 16." A locus where the two alleles differ is called "heterozygous," for example, "12, 14."

In forensic DNA laboratory reports, a homozygous locus is often indicated with a single number, e.g., "16." When two DNA profiles are compared side-by-side, a match means that the DNA could have come from the same source, a determination that is informed ... by the statistical rarity of the DNA profile at issue. *Id.* at § 2.3.

Although the term "match" often is employed when comparing the results of STR analysis, the "more accurate description is that the individual is 'included' as opposed to 'excluded.' " Boies at 413. Using the above example of possible allele pairings, if testing of Sample A and Sample B reveals an allele pairing of "12, 14" at a given locus for both samples, then the samples *could* have come from the same source, and continued matches at additional loci increase the probability that the samples originated from the same individual, or, rather, decrease the probability that the samples

came from different individuals. The individual from whom Sample A was taken remains "included" within the set of individuals who could have provided Sample B. If, however, Sample A reveals an allele pairing of "12, 14" at a specified locus, and Sample B reveals an allele pairing of "16" (indicating a homozygous pairing of "16, 16"), then there is no match between the samples at that locus. Because identical samples will have identical allele pairings, it follows necessarily that the individual from whom Sample A was taken is not the same individual from whom Sample B was taken, so the former is "excluded" as a possible source of the latter.

In the instant case, the sample at issue was collected from Gougler's inner thigh, and contained DNA from multiple individuals, ostensibly from both Gougler and her rapist. To obtain usable information from this sample, the Pennsylvania State Police's forensic scientist, Lisa Mihalacki, extracted two DNA fractions. Mihalacki's report explained: "The non-sperm fraction (F) is enriched for DNA from sources such as white blood cells or epithelial cells (as found in vaginal fluid). The sperm fraction (M) is enriched for DNA from spermatozoa." DNA Report, 5/5/2003, Commonwealth's Exhibit No. 65, at 1. STR analysis of the fractions, revealing the allele pairings at specified loci for both the male and female contributors, then could be compared to known blood samples from both Gougler and Pruitt. Of the fifteen loci tested, Mihalacki's analysis produced no data whatsoever for three loci of the sperm fraction sample, and the data at two loci did not match the results from Pruitt's known blood sample. Mihalacki reported that the results at all five of these loci were "inconclusive due to an insufficient amount of DNA." *Id.* at 2.

Nevertheless, as the Majority notes, Mihalacki testified at Pruitt's trial that, with

regard to the sperm fraction sample, "[e]very genetic marker, every place that we checked from this sample and Michael Pruitt's were identical to each other." *See* Maj. Op. at 398; Notes of Testimony ("N.T."), 4/26/2005, at 313. As Mihalacki's own report demonstrated, her statement was false. Mihalacki proceeded to opine that, based upon her calculations, the odds of the sperm fraction sample coming from anyone other than Pruitt were between one in 1.5 billion and one in 39 billion. *Id.*[2] Pruitt's trial counsel failed to confront Mihalacki with the inconsistencies between her testimony and the conclusions that she drew in her report, failed to challenge Mihalacki's methodology or the reasoning behind her conclusions, and failed to present an expert witness to provide an alternative interpretation of the DNA evidence.[3]

In the post-conviction proceedings, Pruitt presented an expert opinion regarding the Commonwealth's DNA evidence from Randal T. Libby, Ph.D., a forensic geneticist. Dr. Libby opined that Mihalacki's analysis of the DNA testing reflected too many inconsistencies to permit reliable conclusions. Dr. Libby observed that, even with regard to the comparison between a known sample of Gougler's DNA and the female fraction of the thigh swab, which should have produced a perfect match, there were troubling inconsistencies. For instance, at locus "Penta E," Gougler's known sample revealed an allele pairing of "5, 13." However, no "13" allele was discovered at that locus in either fraction of the thigh swab sample. For Dr. Libby, that was a "red flag" that there were "some problems with the testing pro-

cedure." N.T., PCRA Hearing, 8/21/2013, at 54.

With regard to the sperm fraction, which Mihalacki attributed to Pruitt, Dr. Libby noted that the absence of any data at three loci confirmed that the testing process was deficient, in that those loci represented "three significant sites in which there's a failure of the system." *Id.* He noted further that the results of the testing of the sex chromosome revealed additional problems. Although every male has both an "X" and a "Y" sex chromosome, the sperm fraction produced only a "Y" chromosome. Because an "X" chromosome should have been detected regardless of whether the sample came from a male or a female, its absence was "significant" and suggested that "they're not detecting all of the DNA which could be present in the sample." *Id.* at 57. This failure cast doubt upon the results at all of the tested loci. *Id.* at 57.

Most significantly, Dr. Libby observed that, at locus "FGA," Pruitt's known sample revealed an allele pairing of "22, 23," but the sole allele detected in the sperm fraction was "22." Taken at face value, Dr. Libby explained, the results could indicate that the source of the sperm fraction was homozygous at that locus, with an allele pairing of "22, 22." Because Pruitt has a "23" allele that was not present in the sperm fraction, the testing results at locus FGA potentially *excluded* Pruitt as a contributor to the DNA sample collected from Gougler's thigh. *Id.* at 57–58. Mihalacki reported the results at locus FGA as "inconclusive" due to an insufficient quantity of DNA. However, Mihalacki's testing of the sperm fraction at locus "D18S51" similarly indicated the presence of only one

---

**2.** Mihalacki explained that this statistic actually represents "the probability that somebody ... in the world could have the same genetic profile." N.T., 4/26/2005, at 321.

**3.** As the Majority notes, Pruitt was represented by two attorneys at trial.

allele, "16." Yet, Mihalacki did not determine that the results at this locus were inconclusive; she concluded that the source of the sperm fraction was homozygous ("16, 16") at that locus, which was consistent with the allele pairing from Pruitt's known DNA sample. Dr. Libby found no support for Mihalacki's conclusion that, where an apparent homozygous allele pairing matched Pruitt's profile, there was a match, but, where the same test of the same sample revealed a homozygous allele pairing that was inconsistent with Pruitt's profile, the results were "inconclusive." *Id.* at 64–65.

Further highlighting the tenuousness of Mihalacki's conclusions, Dr. Libby noted the possibility that some of Gougler's DNA could have been present in the sperm fraction, allowing for misattribution of certain alleles in the sperm fraction. Dr. Libby noted that "there's oftentimes spillover of fractions, especially if they're disproportionate [in the] quantities of one type of DNA ... versus another source. So it would not be unusual to find a victim's profile in the [sperm] fraction." *Id.* at 69. As such, Dr. Libby opined that, where the results at certain loci revealed alleles common to Gougler's sample, Pruitt's sample, and the sperm fraction, "it's not probative at all since Ms. Gougler's profile would be consistent with the evidence sample as would Mr. Pruitt['s]." *Id.* at 70. After redacting the alleles that Gougler shared with the sperm fraction and, thus, eliminating the alleles that Gougler could have contributed, Dr. Libby concluded that there were only three unique loci in the sperm fraction that were consistent with Pruitt's genetic profile. *Id.* at 72.

Dr. Libby attributed many of the inconsistencies in Mihalacki's analysis to an insufficient quantity of DNA in the tested samples. Notably, Dr. Libby personally examined the slides of the tested genetic material, and he was unable to confirm the presence of any sperm. *Id.* at 79. Dr. Libby explained that, generally, accurate testing requires at least "a couple of hundred" sperm cells, but Pennsylvania State Police scientists reported that they identified possibly one sperm cell. *Id.* at 28, 80. Dr. Libby further noted that Mihalacki had conducted tests to quantify the amount of DNA available for analysis, and those "tests show that there [were] essentially undetectable, unquantifiable levels of DNA." *Id.* at 80. Dr. Libby opined that the testing of an insufficient quantity of DNA does not allow for a justifiable interpretation of the results, and "when you get results which are clearly inconclusive or absent, that tells you that the test results are probably not reliable due to the fact that ... all the DNA is not represented at all the loci." *Id.* at 87–88. With regard to the population statistics that Mihalacki related to the jury, reflecting the astronomical odds against the sperm fraction coming from any individual other than Pruitt, Dr. Libby testified that he understood how Mihalacki calculated those numbers, but opined that they were unreliable. Dr. Libby reasoned that "there are too many inconsistencies in the [sperm fraction] and too many possibilities for the results being not reproducible and not reliable. Too many instances in which there are no data whatsoever which could have resulted in exclusion ... and too many instances of problems that I found through the data." *Id.* at 94.

By way of conclusion, Dr. Libby opined that, to a reasonable degree of scientific certainty, the data generated through Mihalacki's testing was unreliable, and that he would characterize the DNA analysis, overall, as "inconclusive." *Id.* at 95. Finally, Dr. Libby stated that he likely was available for consultation at the time of Pruitt's trial, and that any competent geneticist

should have been able to provide a similar opinion. *Id.* at 95–96.

## II. Ineffectiveness of Trial Counsel

As the Majority notes, Pruitt's lead trial counsel conceded that he did not understand the data contained within Mihalacki's report, and that he actually and merely relied upon Mihalacki's assertions that the sperm fraction matched the known sample of Pruitt's DNA. *See* Maj. Op. at 399. Despite counsel's failure to appreciate the multiple, endemic deficiencies in Mihalacki's analysis, counsel did not consult with a single DNA expert. Absent a rudimentary understanding of the DNA analysis, counsel was unable to conduct an effective cross-examination. Even without a basic familiarity with STRs, allele pairings, and the like, counsel should have been able to recognize and to call attention to the disparity between Mihalacki's assertion at trial of a perfect genetic match and her previous reporting of inconclusive results at five loci. The Majority concludes that Pruitt's trial counsel failed to conduct a professionally reasonable investigation regarding the DNA evidence, and that no reasonable strategy may be discerned from counsel's failure to gain a better understanding of that evidence. *See* Maj. Op. at 400. I agree. Counsel's inattention to the DNA evidence, and particularly the failure to highlight the potentially exculpatory results at locus FGA, is "simply inexplicable." *Id.* at 401.

Nonetheless, the Majority concludes that Pruitt's claim falls short of the standard for ineffectiveness of counsel because Pruitt cannot establish that he was prejudiced by his counsel's deficient performance.[4] The Majority acknowledges the uniquely powerful nature of DNA evidence in the eyes of a juror, and notes that, "were this a case in which identity was in controversy, we would likely find prejudice to be manifest." *Id.* This is not the case, the Majority holds, because Pruitt's "identity as the *robber and killer* has never seriously been put into contest, even at the post-conviction stage." *Id.* at 401–02 (emphasis added). For its finding that there was no reasonable probability that able representation would have affected the verdict, the Majority relies upon Pruitt's consistent admission that he perpetrated the violent attack upon Gougler, upon the fact that the physical evidence made it apparent that a rape occurred, and upon the fact that Pruitt "has never provided any plausible explanation that would persuasively suggest any other person's involvement in the relevant events that took place in the victim's house." *Id.* at 401.

The trial burden never was upon Pruitt, whether to provide a "plausible explanation" to suggest another individual's involvement in the crimes or otherwise. The burden always was upon the Commonwealth to establish Pruitt's guilt beyond a reasonable doubt as to each crime charged.[5] Regardless, information was

---

**4.** To establish ineffectiveness of counsel:
[A] petitioner must demonstrate that: the underlying claim is of arguable merit; counsel had no reasonable basis for the act or omission in question; and he suffered prejudice as a result, *i.e.,* there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.

*Laird,* 119 A.3d at 978 (citations omitted).

**5.** While Pruitt bears the post-conviction burden of establishing prejudice, *see* Maj. Op. at 400 n.6, 401–02 n.10, that burden does not require Pruitt to demonstrate that he could have persuaded the jury of his actual innocence of the sexual offenses. One need not prove *innocence* to obtain an acquittal—it is more than sufficient to show that the Commonwealth has not met its burden to prove *guilt* beyond a reasonable doubt. Here, we are

available to defense counsel that could have raised the possibility that a different individual committed the rape, especially in light of the inconsistencies in the DNA evidence. As the Majority notes, Pruitt gave a statement to police detailing his actions that resulted in Gougler's death. That statement was memorialized in writing and submitted to the jury at trial. Pruitt explained that the incident began when he and another man were smoking crack cocaine in an alley near Gougler's home, but ran out of crack and sought to find money to purchase more. Pruitt's statement began:

> I was getting high, I smoked a lot of bags of crack. Me and this guy was in the alleyway smoking and we just came from the 600 block of 9[th] street and bought 3 bags of crack from there. Me and the guy I was with were smoking it and we smoked it all and we were looking at each other and saying we want more. So we keep walking up the alley and I noticed the lady in the yard and I stopped and told the guys [sic] I was going to try and get some money and he said he was going to try to get some money. [T]hen he kept walking and I stopped and was watching the lady in the yard and waited for her to go towards her door, I pushed her inside and [I] went inside.

Statement, 10/2/2002, Commonwealth's Exhibit No. 61, at 1. Pruitt explained that he demanded money from Gougler and restrained her. He then tied her up with her clothes and a telephone wire so that he could search for money upstairs. He stated that he tied a rag or towel around Goug-

ler's mouth, and that he thought he punched her in the head. After he located some money in a room upstairs, he returned downstairs and discovered that Gougler was dead. He explained that he used the money to purchase more crack, smoked some of it, then returned to the scene, where he untied Gougler's body, began to clean up the scene, and apologized to Gougler's lifeless body. Pruitt then fled the scene.

Notably, Pruitt's confession involved no admission to rape or any kind of sexual offense. At the end of the statement, an investigator asked, "Did you rape the victim?" Pruitt replied, "No." *Id.* at 3. The Majority certainly is correct in noting that, following the introduction of this statement, Pruitt's identity as the robber and killer was not seriously in dispute. However, the statement does not establish Pruitt's identity as the rapist. Although Pruitt admitted both to the police and to other individuals that he committed the acts that constituted burglary, robbery, and murder, and although the fact that a sexual assault occurred was apparent from a medical examination of Gougler's body, Mihalacki's DNA analysis was the sole physical or forensic evidence that purported to connect Pruitt to the sexual offenses.

Had Pruitt's counsel put forth a professionally reasonable effort to undermine the Commonwealth's DNA evidence, Pruitt's identity as the rapist would have been in doubt. It was apparent from Pruitt's confession that he was in the company of another man with whom he was smoking crack immediately before the commission

---

evaluating the effect of counsel's dereliction, and Pruitt need only demonstrate that there is a reasonable probability that, but for the deficient advocacy, the outcome would have been different. The point here, as discussed *infra,* is that effective representation with regard to the DNA evidence would have called Pruitt's

identity as the rapist into question, and would have cast doubt upon the Commonwealth's ability to meet its burden to prove Pruitt's guilt as to that charge. It does not translate into a requirement that Pruitt must have proven the opposite.

of the crimes. Had Pruitt's counsel demonstrated to the jury that the DNA evidence was too unreliable to inculpate Pruitt in the rape, or that it potentially exculpated him, it naturally would follow that the DNA may have come from another individual, perhaps the man who was with Pruitt just before Pruitt entered Gougler's home. Had counsel exposed the weaknesses in the Commonwealth's DNA evidence and the obvious resultant inaccuracy of the asserted population statistics, and highlighted the fact that no other physical or forensic evidence suggested that Pruitt committed the sexual offenses, a significant doubt likely would have remained as to whether the Commonwealth met its burden of proving Pruitt's culpability for rape and IDSI.

Why did this matter? Both Pruitt's trial counsel and today's Majority appear to have ascribed relatively lesser significance to Pruitt's convictions for rape and IDSI, given the weight of the evidence suggesting Pruitt's culpability for murder. At the time of Pruitt's trial, counsel largely disregarded the DNA evidence in favor of focusing upon the elements of first-degree murder. During his closing argument, Pruitt's lead counsel stated expressly:

> Now, I'm also not here to tell you that Michael Pruitt's not responsible for all these horrible things you've heard. Michael Pruitt gave a statement to the police in which he admitted committing offenses.... And I'm also not here to talk about the other offenses. There's only one thing I want to talk about. And that is whether we have second degree murder or first degree murder.

N.T., 4/28/2005, at 631–32. Today's Majority concludes that diligent advocacy with regard to the DNA evidence would not have affected the verdict because, in part, it was clear that Pruitt was the robber and killer. *See* Maj. Op. at 401.

This misses the point. The sexual offenses, and the DNA evidence that purported to prove them, were of undeniable importance to the proceedings, and of particular significance in the penalty phase of the trial. Testifying in the post-conviction proceedings, one of Pruitt's attorneys described what he perceived to be the impact of the DNA evidence and the sexual offenses that it suggested:

> Q: How would you describe [the DNA] evidence in terms of impact on the jury? Do you have an impression?
>
> A: Devastating.
>
> Q: Devastating?
>
> A: Yes.
>
> Q: Why was it devastating?
>
> A: I think it established for the jury beyond a reasonable doubt the charge of rape.
>
> * * *
>
> Q: Have you represented Defendants who have been charged with rape before?
>
> A: Yes.
>
> Q: Does that have any—in your experience, does that [play] any emotional role in the atmosphere of the case that there's a rape charge?
>
> A: Yes.
>
> Q: To the detriment of the client?
>
> A: To the detriment of the client, yes.

N.T., PCRA Hearing, 8/22/2013, at 323–24.

The abhorrent nature of the sexual offenses in this case, and their impact upon the jurors, doubtlessly carried over into the penalty phase of the trial. The prosecutor capitalized upon those offenses in arguing for the existence of the statutory aggravating circumstance under 42 Pa.C.S. § 9711 (d)(6), to wit, that the killing occurred while Pruitt was perpetrating a felony. In his closing argument during the penalty phase of the trial, the prosecutor

mentioned Pruitt's culpability for rape or IDSI nine times. *See* N.T., 5/3/2005, at 156, 158, 165–66, 168. Unsurprisingly, given Pruitt's contemporaneous convictions for robbery, burglary, rape, and IDSI, the jury unanimously found the Subsection 9711 (d)(6) aggravator beyond a reasonable doubt. However, the particular felony or felonies that the jury considered were not enumerated. The jury also found one mitigating circumstance under the "catch-all" provision of 42 Pa.C.S. § 9711(e)(8), that Pruitt had a long history of cocaine use.

Assuredly, even if Pruitt's counsel had been effective in discrediting the Commonwealth's DNA evidence, and potentially obtaining acquittals on the rape and IDSI charges, the jury nonetheless could have found the Subsection 9711(d)(6) aggravator due to Pruitt's contemporaneous convictions for burglary and robbery. Were that the case, however, the jury may have placed lesser weight upon the sole aggravating circumstance. This Court has recognized that "the weighing process involves an assessment of the relative strength and weakness of the aggravating and mitigating evidence, which is necessarily a qualitative and not a quantitative approach, especially when the catchall mitigator is at issue." *Commonwealth v. Daniels*, 628 Pa. 193, 104 A.3d 267, 304 (2014) (discussing *Commonwealth v. Tharp*, 627 Pa. 673, 101 A.3d 736 (2014)). In the instant case, the jury weighed one aggravating circumstance against one "catch-all" mitigating circumstance. We cannot know whether, absent Pruitt's convictions for two heinous sexual offenses, and left with the less emotionally charged offenses of robbery and burglary, the jury's qualitative assessment of the relative strength of the aggravating and mitigating evidence would have led to the same outcome. Perhaps it would have. Perhaps not. The truth revealed about the DNA evidence undermines my confidence in the result.

Had Pruitt's trial counsel provided effective representation with regard to the DNA evidence, there is a reasonable probability that Pruitt's culpability for rape and IDSI would not have been taken for granted during the penalty phase. In turn, there is a reasonable probability that the jury's weighing of aggravating and mitigating circumstances would have produced a different result, *i.e.*, a sentence of life imprisonment rather than a sentence of death. Because this prospect is "sufficient to undermine confidence" in the outcome of these proceedings, *Laird*, 119 A.3d at 978, I would hold that Pruitt is able to demonstrate prejudice, and that he thus has shown the ineffectiveness of his trial counsel. I would remand for further proceedings. I respectfully dissent.